We're going to call case number three, and that is 21-2894, Eric Hovde v. ISLA Development LLC. So, hello, Mr. Veitch. Hello. Good morning. Carson Veitch on behalf of the Appalachians, assisted by Amanda Rauh-Berry, as well. I thought I'd start with an analogy of sorts, and this goes to the two emails that the district court concluded triggered the statute of limitations. And while I think that the forbearance agreement and the argument that there was a new promise to pay actually resolved this case in its entirety, in case the court doesn't feel that way, I wanted to address why I thought the court below erred concerning those two emails. And the analogy I'm going to use is, if my wife and I both work, and we have a gas bill, a big gas bill in the winter at the end of the month for heating the house, and I go to her and say, I'm a little tight this month on money. Would you mind paying the gas bill? In my household, she'd probably say yes, most days. But the point is, I'm, in fact, planning a golf vacation with some of my law school buddies. And so that's really the reason why I'd like to put a little more money in the bank to get ready for that event. And in this case, these emails actually reflect, I think, it can be read to reflect, a situation that's kind of similar to that. Mr. Riegel controlled Isla, Isla Development. He also had 51% ownership of the construction company that was working on it. He had a variety of streams of income that came out of this project. And if you'll note in the appendix in these emails, he never suggests he's not going to pay himself. So I would suggest that what's happening here is something akin to my saying to my wife, I'm a little tight this month. Could you cover the gas bill? But that's not the way Judge Lee, that this is the part of your appeal that really depends on his opinion. That's not the way he looked at it. He looks at the different events of default and says, some of them require background information about actual financial condition. But the inability to pay provision, I'm looking right at his opinion, focuses on what the borrowers admit in writing. And looking at the two emails, especially the September 2 email, it's pretty dire in tone. He's not saying, I'm going to have to divert money from somewhere else. He's saying to clean out all the computer equipment from the offices, instant death of the project, but with no resources of my own. I mean, these are all things that are pretty flat statements. And so coupled with the August email, the district court reads this as the type of statement that I think it's subpart five of the events of default looking for. There's no question that that's how Judge Lee saw that. But why isn't that a perfectly rational way to read those emails? But I think it's also perfectly rational to read them. For example, the August 7 email suggests a payment has to be made on August 17. In the September 2 email, Mr. Riegel doesn't say, oh, we couldn't make that payment. We didn't make it. He doesn't say that. He's not talking about it. The media does say funds of 75,000, 75K are needed by Wednesday morning to avoid having social security persons in Mexico shut down the entire operation immediately. And I would suggest to you that there's nothing in the record that suggests that ever happened. That's not the question. The question is when looking at the language of the contract and an event of default, which is defined as an act of bankruptcy, which is defined as admitting in writing its inability to pay its debts as they matured. And so those strong language, and it sounds like it's increasingly becoming worse, he says these funds are needed to avoid having social security persons in Mexico shut down the entire operation immediately. Which sure sounds like he's saying I can't pay that without more money. Well, what I'm suggesting is that he may be simply saying that I'm not going to pay that, and I want to get more money, when in fact what was going to happen was later if he had to, he was going to find the funds to pay it. And he was just trying to get my client to pony up the money for this because he didn't want to interrupt his own income stream. I think that's another valid interpretation of that. Are you approaching this as though our review of the best way to interpret these, the August and the September emails, is deferential to the district judge? Is it de novo? What do you think it is? It's de novo. Then it's just what we think this is trying to communicate, shut down the entire operation immediately. That doesn't really feel like paying that bill this week. And to add to that, he goes on to say I have no resources of my own. I understand that, and I have no idea whether that statement was true at the time or not. There's a difference between, I guess another point I'm trying to make is there's a difference when you have a project that's having some financial trouble, and you know this was at the time of the worldwide financial crisis. There's a number of approaches. I don't know that that helps you. There's a number of approaches. One of those approaches is to say we're going to cut our expenses so we can pay the bills we have, and I would suggest that you can read that email in that fashion. One of our options here is to shut everything down, suspend the employees, then we don't have to pay them severance, and then systematically pay things off until we can take care of selling the property, which was of course the major asset. And if you have numerous ways to read it, well, you know, somebody had to make a choice of how to read it, and it seems to me that that needs to be, you know, the judge for us. That's right, Your Honor, but I think in this context, it has to be read in the manner most favorable to our client. No, it doesn't. If our review is de novo, I don't think we're required, besides I actually think the reading you're arguing for is a strained one, but on the plain language, if it's a question of law in effect, then we just decide what it means, just like the interpretation of a contract would be. Right, because this decision was on summary judgment though, and everything's supposed to be, we're the non-moving party. Yep, we all agree that this is what the emails said, but I'm not sure that this is one of those things where that rule applies. In any event, he says shut down the entire operation immediately, and so it has to be reasonable inferences, not just any inference. Right, the inference has to be inability to pay bills as they come due. That's a different thing from saying we're going to stop spending money. That's a different thing. Instant death of the project. Well, instant death of the project is not the same thing. This issue isn't about keeping the project alive, it's about paying your bills. And that's the only way to keep it alive. I mean, if you don't pay your bills, it's going to die, isn't it? Look, he's pleading with Mr. Hovda to front more money, and Mr. Hovda is saying, no, I'm not going to do that. I've done that enough times. I don't want to finish, I don't want to cut you off on this point, but I do have a question I want to ask you about the forbearance agreement. Well, Your Honor, we can, I think I've, you know, attempted to make my point about the reading of these emails, and so please. All right, here's my question about the forbearance agreement. I cannot find in the district court your argument that it was a new promise to pay. In your district court summary judgment briefing, you're making a different point. You're saying the forbearance agreement did not expire until December 17, 2008. It's a contract, construed like a contract, thus plaintiff's complaint filed in this cause on November 2 was well within the 10-year statute of limitations, even if the court accepts the theory that the note matured on some other time. So that's basically saying we got the extra days under the forbearance agreement. I don't see anything about it being a new promise to pay, and if that's true, then you may have forfeited this argument. Well, Your Honor, I don't think the magic words new promise to pay were used below. It's more than magic words, though. It's the concept of whether there's a brief period of time. It's about 42 days or so, right? A brief period of time deleted, and then the clock starts ticking again on the old promise to pay or whether there is actually a new promise to pay. That's right, Your Honor, and Judge Lee analyzed that. He conceived it as a tolling issue. It was stopped for 42 days, but the statute, which was before Judge Lee and along with the forbearance agreement, is extremely clear that the 10 years runs from the new promise. Yes, but you can't expect Judge Lee to look, or any district court judge, to look at the agreement and start making arguments for you. I had the same concern that Judge Wood did. I didn't see anywhere in your arguments before the district court where you said the forbearance agreement triggers a new obligation or a new promise to pay. Everything was focused on the loan agreement and the guarantee, so that's really the question. Well, as Judge Lee recognized in his opinion . . . Where did you argue that is the question? Exactly. Where in the record can we find that? I think there are . . . I can't tell you standing here, but it's in our reply brief, I believe, that there's a reference to . . . In the district court? It's a reference to several citations from the . . . several parts of the record from the district court. That's my . . . Are you saying that this precise legal theory, that the forbearance agreement was a new promise to pay that reset the limitations clock, was actually argued to the district court and if so, where can we find that? Because we, I didn't and I take it that neither did the other two judges. Well, I don't know that those magic words were used, but the concept of the forbearance agreement was resetting or . . . But where did you put forth whether you used the magic words or not? Just putting a document in front of the district court and asking the district court to start making your arguments for you doesn't work. Where did you make the argument that you were entitled to summary judgment or that summary judgment should not be granted for the other side because this forbearance agreement started a new obligation for them to pay you as opposed to the loan and the guarantee? I think the argument that was made was that the forbearance agreement impacted the running of the statute of limitations. Judge Lee talked about it in terms of tolling. And how is . . . How does that equate to what you're arguing before us that nothing to do with the statute of limitations, that it's a new obligation to pay that was timely raised? Well, because the statute in question says that the new promise to pay explicitly says that it starts the clock anew from that point. And so as the Bew case, the district court decided, said that if the argument made later stems out of the claim or the set of facts that was presented below, then you should be allowed to argue it at the appellate level. And below, we argued the forbearance agreement. That's acknowledged in the . . . in Judge Lee's opinion. But you argued a different argument about the forbearance agreement. That's what the challenge is. This argument grows out of the same set of facts. But it doesn't. A 42-day pause based on an old promise triggers a completely different statute of limitations from a new promise for which you would have, for all I know, another 10 years to sue on. A new promise . . . This happens all the time in debt collection practice cases where the debtor makes a new promise to pay and the debt collector is rid of a statute of limitations issue. It's a completely different theory. But, Your Honor, I believe it grows out of the same set of facts. We argued below that the forbearance agreement . . . the impact of that on the statute of limitations was that it changed the statute of limitations and made the old one not relevant anymore, the date from the original one. That argument was made, and it's clear from the opinion that Judge Lee believes that we made that. And I believe it stems out of the same argument. I would say it's a slightly new twist on an argument that was made below. What? A slightly new twist? Same statute, same forbearance agreement. And we argued below that that forbearance agreement impacted the statute of limitations. You only have 19 seconds, but I would like you to turn briefly to the guarantee agreement, if Judge Roper will indulge. Of course. Because that's where we have two different district judges coming to two different conclusions. Judge Lee believes that the hovdas should prevail on that, and Judge Valderrama saw the limitations. So if you could just say a word about that, that would be helpful. I think in the interest of time, and I'm sure you're familiar with it, I think that this is addressed in pretty much detail in our briefing. But the law in Illinois is that general waivers are permitted. Waivers of all defenses are permitted. There are two major exceptions. One is the covenant of fair dealing, the other is commercial reasonableness. That's supported in the case law, so I think Judge Lee was correct. Your opponents say that the rule is actually more broadly different for statutory affirmative defenses. The RBS case decides that it waives a statutory defense. And there are numerous cases that say— As long as you're specific enough. I mean, the problem is this didn't single out the statute of limitations. It's all equitable and legal defenses. And we're dealing with sophisticated clients. Mr. Riegel was represented by NILO, we're represented by counsel. That guarantee and its waiver of defenses and its continuing nature is very, very clear, very explicit on the face of that guarantee. You're relying on RBS, so I don't think the RBS court actually reached that issue. Well, it's kind of a funny decision because they say it waives it. They say it waived the statutory defense. In that case, it was the Interest Act. They then go on to hold that it wasn't a violation of the Interest Act anyway. I think they found that it wasn't properly preserved, so they didn't address it. Perhaps you're—I'm not going to—I recall it a little bit differently, but I— Okay. You're the judge, you're probably right. Thank you. I originally intended to reserve five minutes. I know. I'm going to give you some time. Yeah. Okay. Thank you very much. Thank you. Morning, Mr. Jordan. Good morning, Your Honors. If it pleases the Court, I'm Gregory Jordan. I represent ISLA Development, LLC, and Jeffrey Riegel. The Hubdees have failed to argue that the Forbearance Agreement reset the statute of limitations. In their reply brief, they talk about their memorandum in support of summary judgment and their reply brief. There are several comments they make in the paragraphs they mentioned. They talk about the fact that there was a Forbearance Agreement, that ISLA and Hubdees were the only parties that signed it, that MACA parties had a loan, that Riegel said that the MACA loan, if they got it, would pay outstanding payables, and that on December 17th, Riegel told the Hubdees that he wasn't pursuing a loan. And then they also say that the agreement—because in there, underneath, what they did was they wrote in a tolling term into the document, and it said, well, it didn't expire until December 17th, which, by the way, you can't write in—the court can't write in terms into the document, as I'm sure you all know. In the reply memo, they just say that the cause of action commenced after the expiration of the Forbearance Agreement because of the unwritten tolling term. Parties—commercial parties often enter into tolling agreements. Can you walk us through exactly what argument regarding the Forbearance Agreement was made by the plaintiffs in the district court, and how that differs from the one made here, to such an extent that the argument before us was forfeited? Sure. That would be helpful, I think. Okay. Let's—first, if I may, the standard, the new twist standard, if you look, the court in 422 and 436 said that a new twist is a modest expansion upon or variant. Now, what happened underneath is that they said, okay, we've got a Forbearance Agreement. Hovde and Isla signed it. Regal's going to try to get this money from these Maka parties. The Maka parties are these condo owners who are trying to save their investment, that he was going to pursue financing, and that he failed. That's what they said underneath. In the reply brief, all they say is, well, it was told until December 17th, not November 5th. They said December 17th. That's the sum total of their argument as far as what the importance of the Forbearance Agreement was, other than they called it a contract, and they even cited the Tower case, which said that if an insolvent party makes an agreement of signs of Forbearance Agreement, it's not enforceable. That was supporting their argument that it was a contract. So there was no similar argument there. And each of the cases, Billup, Wajonka, and the other one, sorry, just talked about the twist, which, like I said, it's just a modicum change of or a variant and not, well, I mentioned the word Forbearance Agreement, and I have this terrific argument now that I wish I had, or my prior counsel had made underneath, even though he didn't. So turning to the emails, Mr. Regal said, in addition to the fact that he couldn't pay the taxes, he told Stephen Hovde, I didn't pay the management team last week. That's not telling your wife, hey, you know what, I'm a little short. That's saying, you know what, I missed the mortgage payment. That, and he said it in writing, he made an admission, unqualified, of the inability to pay debts as they matured. He also said, as I believe Judge St. Heves said, our Social Security is coming next week, I got a truck, they're going to back it up, they're going to take everything away. Now, for some reason, the Hovdes think that Regal had some sort of incentive to lie. He certainly had none. What he had was a desperate situation in the calamity of 2008. I need more money. If I get more money, maybe I can save this thing. I'm searching every pocket I can find all over God's green earth for money, and I can't find it. I need you to step up. And you know what Stephen Hovde said to him on an August 7, 2008 email? He said, shut down. He didn't say, well, listen, you know what, you're probably just playing games with me. He said, shut down the project. This is sort of neither here nor there, but did this project ever get completed? Is it just sort of sitting there half finished in Isla Mujeres? It is halfway finished, sitting there in Isla Mujeres. Technically, Islam Mexico owns the project. And there's litigations in Mexico? Actually, I take that back. I apologize. They sold their rights to another party, but it's just sitting there. I checked on that. And there is litigation still pending in Mexico over all of this? There is a foreclosure case in which the Hovdes failed to join Isla development, and so their case got dismissed. So they didn't have terrific lawyers down in Mexico, I guess, but it dragged on for a while. And by the way, this debt, which I think they mentioned in the briefs was $4.4 million. In their complaint, they said it was $90 million. Yeah, what is it now? We tried playing around with compound interest, because obviously it's a hugely high interest rate. I think it's about $130, $135 million. Just compounding interest. Were there more extensions of money? I was a finance major undergrad. I used to be a general counsel at a bank, and I couldn't figure it out. You've got to take the interest on the interest. Yeah. And it's just interest on interest, which maybe that's why the Hovdes waited 10 years and two months. I don't know. I don't know. I do want to ask you, though, about the guarantee also, because you argue strongly for some kind of knowing, voluntary, and intentional standard for waivers. If somebody's waiving statute of limitations and some almost clear statement rule, it's the statute of limitations I'm waiving. I couldn't find any Illinois case that went that far. And we are, of course, here in diversity, so we need to ground whatever we do in Illinois law. OK. You start with Gallagher versus Leonard, which sets the proposition in the workers' comp context. The workers' comp has a certain statutory status, if I could say it. Well, what is the difference between an important statute and an unimportant statute? How is this part— one of these things that is not readily waivable? But expressing the one thing, does that mean that no others apply? Northbrook, which is a guarantee case, albeit with regard to the deed in lieu, noted that clear expression of statutory waiver was required. And they said that guarantors are the favorites of the law, thus that it's even more important in a guarantee situation than other situations, and that it's kind of a tie-goes-to-the-runner rule. If there's a question, then the benefit of the doubt goes to the guarantor. Also, in Ray Marish of Tudor, the bankruptcy court determined that a waiver of post-judgment interest was sufficiently important that a specific statute—that that statute was specifically important that they had to have a clear and explicit waiver. Then, in Elsinore v. Brown, there was a question of a waiver of attorney's fees under the statute. And in that case, they said, no, it's got to be clear and explicit. So you have a number of Illinois decisions, and each of them are tied in through the citation to Gallagher. And there is none of them— but you would need to find that something was related to workers' comp, I think. I mean, our court has had some cases that have attempted to apply Illinois law. Maybe we've gotten it wrong. Always possible. But there's Chrysler Credit Corporation against Marino, 1995 decision, where a guarantee defeats fraudulent concealment, commercial reasonableness defenses, defenses that are important from a public policy point of view. I understand that. And I think, oddly enough, when they mentioned the Marino case that Chrysler is money good, I did have a chuckle. But they're saying there that these general common law concepts are overridden. The court below agreed with that. I agree with that. Mr. Veach agrees with that. The question is, Marino didn't deal with the statute. Gallagher did. Elsinore did. Northbrook did. Tudor did. And they also— But you're asking us to infer from that pattern that Illinois will then take the next step and say, all statutes. And that's what I don't find. I would say even if not all statutes, given the situation of the standing of a guarantor and the importance of the statute of limitations, which I think you pointed out by looking at a $4.4 million debt that's at least $104 million, because that's what they said it was in their motion for summary judgment, the economic benefit, the benefit of the greater good in enforcing the statute of limitations is sufficiently important that it should apply in this case, even if you would say, well, I'm not quite understanding why it applied for waiving attorney's fees and waiving post-judgment interest. Why isn't it just as reasonable to say, you know, this was a contract. Mr. Riegel was a sophisticated person, so the hope is—and, you know, he could have put in some waiver of statute of limitations, and he didn't. Well, first off, I'm not sure that anyone is contemplating that the HUD should be so stupid to wait 10 years and two months. And second, I don't think— It may have been very wise, but the 25 percent, you know, if money was growing faster under this contract than it would have out in the market, maybe they knew what they were doing. Well, if you look at an unfinished project that hasn't been worked on since 2008, I don't know about that, but it's the importance of the rights of the guarantor, and it's just taking the national extension of the Gallagher v. Leonard case, which several other Illinois courts have done, to say that at the very least Northbrook, talking about the importance of the rights of the standing of guarantors, coupled with the finality that's required in the statute of limitations, and I think someone mentioned the idea that the debt collectors who try to trick people into new promises, you know, if people can get around that, there should be a strong public policy for enforcing the statute of limitations when people don't get tricked. You know, this is an important statute because it allows people to restart. It's a button that restarts the clock in the other way. And if I had to pick a right that is really important in commercial enterprises, and I guarantee you the argument that they made about this affecting all sorts of banks, real banks have regulators, they have examiners, they have auditors, they have credit committees, they have collection departments, they're not going to wait ten years. This isn't affecting people, this is really predatory to wait that long in most cases. And here it provides Mr. Riegel, Isla Development, Isla Mexico, with the opportunity to move forward, because without that, they're done. Were your clients negotiating with the Hubtys during this ten-year period, or did communication stop? I don't think the friendliness was there when they were suing them for the foreclosure, so I don't believe there was any negotiation. Before, oh, so when the foreclosure in Mexico was going on. 2011. Okay. I don't know what happened before that. I truthfully met Mr. Riegel in November 2018, so anything I know is hearsay, but I don't get the sense of Christmas cards being exchanged or settlement offers going back and forth. Were they communicating or attempting to resolve it in any way? It just seems like a long time. It was a war without background communications, as far as I could tell. Yeah, and it has gone on. It is, you know, it's getting into the John Riegel versus John Dice territory. Did your client ever pay any of the principal back? No, no. Never paid anything. The whole thing kind of fell apart. They sold the rights to the project in 2016, and now they're just, you know, trying to get on with their lives. Okay. I'm out of brilliant ideas, if you have any other questions. No, we're out of brilliant questions. I will, since I have 30 seconds, I will say one thing. It is an honor and a privilege to appear here, but also for a 63-year-old man who can't play sports anymore, it truly is fun. And I think that everybody else who appears from you is probably as wise as the woman to say that to you. But it truly is such a privilege, such an honor, and great fun. Thank you so much. Listen, we're so happy to have people that like us, let alone are having fun. All right. Two funs for the day. That's right. Okay, come on up, Mr. Feech, and have a great time. I have a question for you even before you begin, but I am going to give you your five minutes, okay? Here's what I want to know from you. With respect to the waiver argument, the language of the entire provision solely applies to a guarantor's obligations and provides that the obligations are unconditional, regardless of any legal or equitable defenses. But the statute of limitations is a defense that addresses enforceability, not legal obligations. And we've recognized that most states, including Illinois, consider legal obligations to remain even after the statute of limitations is run and precludes enforcement in courts, given that the language applies only to obligations. Why should we read it as waiving the statute of limitations defense that addresses only enforceability? I think, for several reasons, the guarantee is unconditional and continuing until those obligations are satisfied. And at the same time, all legal and equitable defenses are waived. So they only have meaning in terms of enforceability. In other words, if you waive your legal and equitable defenses, you're waiving them in terms of enforceability. So I think the guarantee both continues the obligation, I would say beyond the statute of limitations, until the obligation has been satisfied. But it also waives, in our view and in Judge Lee's view, waives the statute of limitations in terms of the enforceability of the obligation. So that would be my answer to that question. I think I might be able to give a little bit of more color than my colleague was able to. I think he's right that there probably were not very many negotiations. I can't say that there were none. I can tell you I've only been involved in this case since after the district court. And I can tell you that there have been, in more recent history, some discussions. What took so long? Well, I don't know. The problem is my representation started in the fall. I would think that would be one of the first questions you'd ask your client. What took so long? I think the problem is that there was all this litigation in Mexico. I don't think that litigation was friendly. In fact, that litigation continues. And it was like, for example, news to me that Mr. Regal had given away his rights to this property in 2016. You mean today it was news to you? That was news to me. Now, maybe my prior counsel, who's retired, would have some information for me about that. But he's not involved in the Mexican litigation at all. And I've only spoken with the lawyers in Mexico once since I got involved in the case, because that's sort of on a separate path. But I think because that was pretty acrimonious litigation in Mexico. And my guess is it's correct that at least for some time, certainly until recently, until 2018, there wasn't any conversation back and forth. There was just litigation in Mexico and then litigation here. I would like to add a little— It strikes me that there are risks in an approach that's that siloed. Maybe you missed some of the— Well— Connections. I wish I could speak. Obviously, you can tell that they were going back and forth back in the 2008 era, and they were having some discussions. And I suspect those discussions extended beyond that. But I don't know for how long. And I don't know. Obviously, we're here today, so not at least thus far to a good end. On the Northbrook case, I'd like to make one comment. The waiver at issue in that case did not—the guarantee did not waive all legal and equitable defenses. It didn't have the same language as the guarantee and the waiver in the present case. And also, that was an unusual situation because you have a statutory scheme where if you choose to give the property back, to give the deed in lieu of satisfying it, there's an actual statute that says if you want to have a guarantee continue, it's got to be contemporaneous. So I don't think that case is really all that relevant to what you're deciding here today. So I guess I would like to leave you with two thoughts. One, I believe in all the arguments we made. I think Judge Lee certainly had it right on the waiver issue and the guarantee. And the last one is, I like it here, too. I think you've started something. If you just make a recording of the people who have appeared in front of you today, and just play it to people before they start their arguments. Are you having fun? Oh, that's the question. I always have fun. Such an amazing panel. Yeah, exactly. All right. So thank you all very much. Thank you very much. Oh, my goodness. Oh, my goodness. This is—oh, the world should be here. Thank you. Thank you so much. Let's see, where are we?